FILED
2020 Jun-01  PM 05:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TAMMY JOHNSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:17-cv-01202-MHH** |
| | } | |
| **LA PETITE ACADEMY, INC., and** | } | |
| **FELICIA GIST,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

In this employment action, Tammy Johnson contends that her former employer, La Petite Academy, Inc., discriminated against her because of her race and age and created a hostile work environment that left her no choice but to resign. Ms. Johnson brings the following claims against LPA: (1) discrimination, retaliation, and hostile work environment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; (2) discrimination, retaliation, and hostile work environment on the basis of age in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Alabama Age Discrimination in Employment Act, Ala. Code § 51-1-20; and (3) negligent and wanton hiring, supervision, training, and retention in violation of

Alabama law.[1]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, LPA has moved for summary judgment on Ms. Johnson's claims.  According to LPA, no genuine dispute of material fact exists as to Ms. Johnson's claims, and LPA is entitled to judgment as a matter of law.  The company contends that no evidence of race or age discrimination or retaliation exists, that Ms. Johnson voluntarily resigned and was not constructively discharged, that the company did not create a hostile work environment, and that Ms. Johnson has not stated an underlying cause of action for the violation of Alabama common law to support a negligent hiring, training, supervision, or retention claim.  For the reasons stated in this memorandum opinion, the Court will grant LPA's motion for summary judgment.

## I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion

---

[1] Ms. Johnson's counsel agreed to voluntarily dismiss her state law claims for intentional infliction of emotional distress, invasion of privacy, and interference with business relations that she brings against LPA and her former supervisor, defendant Felicia Gist.  (*See* Doc. 56, ¶ 2; Doc. 56-1, p. 2).  In a footnote in her brief in response to LPA's motion for summary judgment, Ms. Johnson "moves to voluntarily dismiss [those three state law claims], without prejudice, and costs taxed as paid." (Doc. 69, p. 34, n. 11).  The Court has entered a separate order dismissing those state law claims without prejudice, which eliminates Ms. Gist as a defendant in this case.  (Doc. 75).

for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, in this opinion, the Court presents the evidence in the light most favorable to Ms. Johnson and draws all inferences from the evidence in her favor.

## II.   BACKGROUND

Ms. Johnson is white. (Doc. 59-1, p. 50, tp. 193; Doc. 64-1, p. 2, ¶ 2). She began working for LPA in 2012. For two years, she worked as the Academy Director of LPA's child daycare facility in Hoover, Alabama. Then she took 18 months off, and in January 2016, LPA rehired her as the Academy Director of LPA's childcare facility in Decatur, Alabama. (Doc. 64-1, pp. 2–3, ¶¶ 2–3). She resigned from the Decatur facility on June 27, 2016. (Doc. 59-3, p. 1). When she resigned, Ms.

Johnson was 49 years old.  (Doc. 64-1, p. 2, ¶ 2).  This case arises out of events that took place during Ms. Johnson's employment at LPA's Decatur facility.

### A.   Ms. Johnson's Tenure as Academy Director

The record shows that Ms. Johnson was a highly effective Academy Director. When she assumed leadership of the Decatur facility in January 2016, LPA described the facility as "in distress" because of low enrollment and poor business operations.  (Doc. 64-1, p. 3, ¶ 4).  The facility had only 30 children enrolled.  (Doc. 64-1, p. 3, ¶ 4).  Ms. Johnson improved the facility's operations and grew enrollment to approximately 85 children over the span of only a few months.  (Doc. 64-1, p. 3, ¶ 4).  The Decatur facility met all budget numbers and was deemed profitable under her leadership.  (Doc. 64-1, p. 3, ¶ 4).

At first, Priscilla Kimball, who is white, was the District Manager for all of LPA's daycare facilities in Alabama and was Ms. Johnson's direct supervisor.  (Doc. 64-1, p. 3, ¶ 3).  In February 2016, Felicia Gist, who is black, replaced Ms. Kimball as the District Manager.  (Doc. 64-1, p. 3, ¶ 3).  Ms. Kimball supported Ms. Johnson and helped her succeed.  According to Ms. Johnson, Ms. Gist did not.

Ms. Johnson experienced problems with her Assistant Director at the Decatur facility, Chanté Pettus, who is black.  Ms. Johnson testified that during her first week at the Decatur facility, Ms. Pettus "cornered [her] in the kitchen and would not let [her] out of [the] kitchen."  (Doc. 64-1, p. 15, ¶ 29).  Ms. Pettus "was yelling and

acting out of control," and Ms. Johnson "was genuinely afraid for [her] safety." (Doc. 64-1, p. 15, ¶ 29).  Ms. Pettus told Ms. Johnson that she (Ms. Pettus) "did not want [Ms. Johnson] there and that [the Academy Director position] should have been her job, that she was overlooked."  (Doc. 59-1, p. 44, tp. 170).

Ms. Johnson reported the incident to Ms. Gist.  (Doc. 59-1, pp. 48–49, tpp. 187–91).  Ms. Johnson also reported to Ms. Gist that Ms. Pettus "was being very aggressive towards the staff with a loud tone of voice" and demeaned employees. (Doc. 59-1, p. 48, tp. 187).  Other employees at the Decatur facility made similar complaints about Ms. Pettus to Ms. Gist.  (Doc. 59-1, pp. 48–49, tpp. 187–89).

To investigate the complaints about Ms. Pettus, Ms. Gist interviewed Ms. Johnson, Ms. Pettus, and several other employees at the Decatur facility.  (Doc. 59-1, pp. 48, 50, tpp. 187–88, 194).  Ms. Gist then met with Ms. Johnson and Ms. Pettus. (Doc. 59-1, pp. 49–50, tpp. 191–92, 196).   At the meeting, they discussed Ms. Pettus's tone, Ms. Gist instructed Ms. Pettus to let Ms. Johnson address the employees and the parents, and Ms. Gist said that she wanted Ms. Johnson to mentor Ms. Pettus. (Doc. 59-1, p. 51, tp. 197).  Ms. Gist also told Ms. Pettus that, as African American women, they both had to work harder than others to prove themselves. (Doc. 59-1, p. 49, tp. 192).  Ms. Johnson was shocked that Ms. Gist, as a member of management, would say that in front of her.  (Doc. 59-1, p. 50, tp. 193).  So Ms. Johnson called LPA's Southeast Division Vice President, Cindy Lehnhoff, and

reported what Ms. Gist said. (Doc. 59-1, p. 51, tpp. 199–200). LPA did not act on Ms. Johnson's complaint. (Doc. 59-1, pp. 52–53, tpp. 204–05).

Ms. Johnson then began to document Ms. Pettus's performance issues. On March 22, 2016, Ms. Johnson prepared a "Note to Employee File"—a form documenting a manager's concern with an employee—about Ms. Pettus transporting children in a bus without proper safety seats. (Doc. 59-1, p. 60, tpp. 234–35; Doc. 60-17, p. 4). And on April 1, 2016, Ms. Johnson prepared a Note to Employee File about Ms. Pettus's failure to complete mandatory Alabama Department of Human Resources training. (Doc. 60-17, p. 2).

In her affidavit, Ms. Johnson describes several other issues she had with Ms. Pettus in varying levels of detail:

- "Ms. Pettus . . . would complain about me to Ms. Gist two to three times a week." (Doc. 64-1, p. 4, ¶ 7).

- "[S]ome of the teachers were leaving the facility because of Ms. Pettus'[s] conduct and how she addressed and interacted with the staff." (Doc. 64-1, p. 4, ¶ 8).

- Ms. Johnson became concerned that Ms. Pettus's conduct would cause children under Ms. Johnson's supervision to be harmed, "so as to force [Ms. Johnson] to quit." (Doc. 64-1, p. 5, ¶ 9).

- While Ms. Johnson was on vacation, Ms. Pettus and Ms. Gist "bombarded" her "with text[s] and emails about issues that were not emergency situation[s]." (Doc. 64-1, p. 6, ¶ 12).

- When Ms. Johnson returned from her vacation, "Ms. Pettus would have [Ms. Johnson's] desk piled high with files, notes and work that [Ms. Pettus] insisted

[Ms. Johnson] complete even though [Ms. Pettus] was the assistant and in charge when [Ms. Johnson] was away from the facility." (Doc. 64-1, p. 6, ¶ 13).

- While Ms. Johnson was on leave, Ms. Pettus called Ms. Johnson "a minimum of 10–12 times a day and [Ms. Johnson] was returning calls from parents and teachers for 3 to 4 hours each night." (Doc. 64-1, p. 7, ¶ 14).

- Ms. Pettus did not lock the facility and left windows and doors open before she left for the day, which caused the facility's alarm to go off, and required Ms. Johnson to respond to the police. (Doc. 64-1, p. 11, ¶ 22).

- While Ms. Johnson was on leave, Ms. Pettus did not tell her that she (Ms. Pettus) and Ms. Gist had terminated a white teacher for allegedly hitting a child. Though Ms. Pettus always pestered Ms. Johnson while she was on leave about unimportant matters, nobody called Ms. Johnson to tell her about this serious matter. (Doc. 64-1, pp. 7, 11–12, ¶¶ 14, 22).

- "[Ms.] Pettus made remarks to staff that she wanted the Caucasian staff gone or she would try her best to make it as if they were not doing [their] job. . . . [She] was always very vocal and loud toward the Caucasian staff. She would make it harder on them and would be more critical when checking their rooms and just picking out things that were not pressing. The Caucasian workers were intimidated by [Ms.] Pettus and would just quit because of how they were treated by [Ms.] Pettus." (Doc. 64-1, p. 16, ¶ 30).

- "There were days I would have employees wait on me before we would go out to our cars because of [Ms.] Pettus and her actions. On other days I would move my car close to the door in the event she was waiting for me after work. I was just unsure of what she might do because she was so volatile and abusive. [Ms.] Pettus was also very intimidating." (Doc. 64-1, pp. 16–17, ¶ 31).

- After Ms. Johnson issued a Performance Improvement Plan to Ms. Pettus at the direction of "Corporate," "personal items in [Ms. Johnson's] office were either destroyed or went missing. Framed pictures of my children would be broken and lying on my desk. When I would ask [Ms.] Pettus what happened, since she shared my desk in my absence, she would say she did not know or would ignore my questions. It really would make things worse when I tried

to discipline [Ms.] Pettus and did no good in trying to correct her behavior." (Doc. 64-1, pp. 17–18, ¶ 32).

Ms. Johnson issued the Performance Improvement Plan – PIP – to Ms. Pettus on June 7, 2016.  (Doc. 59-1, pp. 60–62, tpp. 235–42; Doc. 60-17, pp. 7–9).  In the PIP, Ms. Johnson wrote that Ms. Pettus had a documented history of unprofessional conduct towards other employees; that Ms. Pettus improved only temporarily when confronted and always reverted to aggressive behavior; that Ms. Pettus led by fear; and that Ms. Pettus's behavior concerned parents.  (Doc. 60-17, p. 7).  The PIP instructed Ms. Pettus to adjust her communication style immediately or else risk termination.  (Doc. 60-17, p. 7).  According to the PIP, Ms. Johnson would coach, mentor, and provide feedback for Ms. Pettus.  (Doc. 60-17, p. 7).  Ms. Johnson felt like Ms. Gist favored Ms. Pettus because Ms. Gist showed up unannounced to the meeting at which Ms. Johnson gave Ms. Pettus the PIP.  (Doc. 59-1, p. 111, tpp. 442–43).

Still, Ms. Johnson frequently sought help with Ms. Pettus's performance issues from Ms. Gist.  (*See, e.g.*, Doc. 59-1, p. 54, tp. 209; Doc. 64-1, p. 4, ¶¶ 6–8).  Ms. Johnson reports that Ms. Gist never helped her and instead joined Ms. Pettus to undermine her (Ms. Johnson).  (*See, e.g.*, Doc. 64-1, pp. 4–5, ¶¶ 6–10).  Ms. Gist's alleged support for and concerted activity with Ms. Pettus underlies Ms. Johnson's allegations of discrimination and hostile work environment in this case.

In her affidavit, Ms. Johnson provides in varying levels of detail facts concerning Ms. Gist's continuous efforts to force her out:

- Ms. Gist visited the Decatur facility two to three times a week—an unusually frequent amount—and often communicated with Ms. Pettus instead of Ms. Johnson during those visits. (Doc. 64-1, pp. 4, 14, ¶¶ 7, 26).

- "Ms. Gist became increasingly critical of me and my performance and was openly hostile. Often Ms. Gist would totally ignore me and make it plain that she abhorred even having to talk or deal with me. Ms. Gist also made it obvious that she wanted Ms. Pettus in my position." (Doc. 64-1, p. 4, ¶ 7).

- Ms. Gist did not believe Ms. Johnson's and other employees' complaints about Ms. Pettus. (*See* Doc. 64-1, p. 4, ¶ 8).

- "Ms. Gist refused to take any corrective action [against] Ms. Pettus and further enabled Ms. Pettus in her escalating hostility and undermining of me." (Doc. 64-1, pp. 4–5, ¶ 8).

- "It became apparent that Ms. Gist intentionally favored Ms. Pettus in all discussions regarding the facility." (Doc. 64-1, p. 5, ¶ 9).

- "I received absolutely no leadership or response from Ms. Gist to be successful in my position as Director." (Doc. 64-1, p. 5, ¶ 10).

- Ms. Gist constantly called, texted, and emailed Ms. Johnson about nonemergency matters during Ms. Johnson's vacation days. Ms. Gist required Ms. Johnson to maintain her duties when off work. (Doc. 64-1, pp. 6, 8–12, ¶¶ 12, 16, 18, 21–22).

- LPA granted Ms. Johnson's request for eight days of leave in June 2016, but Ms. Gist still required her to travel to Atlanta for a two-day training seminar. (Doc. 64-1, pp. 7, 12, ¶¶ 14, 23).

- Ms. Gist's "demeanor and direction would change and become hostile and condescending" when Ms. Pettus joined meetings between Ms. Gist and Ms. Johnson. (Doc. 64-1, p. 8, ¶ 15).

- Ms. Johnson suspected that Ms. Gist inappropriately accessed Ms. Johnson's email account because Ms. Johnson emailed a complaint about Ms. Gist to HR and HR responded that Ms. Gist had given them a "'heads up' about [Ms. Johnson]." (Doc. 64-1, p. 9, ¶ 17).

- "Ms. Gist did not lobby with corporate for [Ms. Johnson] to take time off" as Ms. Johnson testified it was Ms. Gist's job to do. (Doc. 64-1, p. 10, ¶ 20).

- When the facility's alarms went off at night because Ms. Gist and Ms. Pettus did not secure the facility properly, Ms. Gist made Ms. Johnson drive to the facility, and did not agree to let other managers who lived ten minutes away from the facility to go to the facility instead. (Doc. 64-1, p. 11, ¶ 22).

- After Ms. Johnson resigned, Ms. Gist took Ms. Pettus to dinner and promoted her to Ms. Johnson's vacated position, but Ms. Gist had never invited Ms. Johnson to lunch, dinner, or coffee. (Doc. 64-1, p. 14, ¶ 27).

- Ms. Gist told Ms. Johnson to "stop being silly" when Ms. Johnson reported that she felt anxious and intimidated by Ms. Pettus confronting her about wanting her (Ms. Johnson's) job. (Doc. 64-1, pp. 16–17, ¶¶ 29, 31).

- Ms. Gist accused Ms. Johnson of stealing an iPad. (Doc. 64-1, p. 13, ¶ 25).[2]

During her deposition, Ms. Johnson testified that she felt that Ms. Gist was undermining her because Ms. Gist would call the facility only to speak with Ms. Pettus, would go directly to Ms. Pettus during her visits to the Decatur facility, would conduct walkthroughs of the facility only with Ms. Pettus, and would not tell Ms. Johnson about what Ms. Gist and Ms. Pettus discussed during the walkthroughs.

---

[2] In several instances in her affidavit, Ms. Johnson states that Ms. Gist "create[d] an intolerable and hostile work environment," "set [her] up for failure and termination or forced to quit," created a "racially hostile environment," and engaged in "constant racial harassment and discrimination and . . . retaliation." (Doc. 64-1, pp. 5–7, ¶¶ 9, 11, 15). These conclusory allegations cannot create a genuine dispute of material fact. *See Stein*, 881 F.3d at 857

(Doc. 59-1, pp. 56–57,111–12, tpp. 217–21, 439–41).   Regarding the stealing accusations, Ms. Johnson used a company iPad from the facility to work from home as she thought she was directed and allowed to do.   But Ms. Gist called her to tell her that she could not take the iPad home, asked her if she knew that the iPad had a tracking device in it, and asked her to return the iPad.   Ms. Johnson took these statements as an accusation that she stole the iPad.   (Doc. 59-1, pp. 64, 110, tpp. 253–55, 437–38).

Ms. Johnson complained several times to Ms. Lehnhoff and LPA's HR Manager, Brandy LeJeune, that Ms. Gist and Ms. Pettus were discriminating against her on the basis of race and creating a hostile work environment.  (Doc. 64-1, pp. 5–6, 8, ¶¶ 11, 16).  Ms. Johnson was so distressed by Ms. Pettus and Ms. Gist that she sometimes would be crying when explaining her hostile work environment to Ms. LeJeune and Ms. Lehnhoff.   (Doc. 59-1, pp. 114–15, tpp. 451, 454).   But Ms. Johnson testified that Ms. LeJeune and Ms. Lehnhoff did not investigate her complaints or "cure the racially hostile environment."  (Doc. 64-1, p. 6, ¶ 11).

## B.   Ms. Johnson's Resignation

While dealing with Ms. Pettus and Ms. Gist at work, Ms. Johnson was dealing with significant family stress outside of work.   Soon after Ms. Johnson started working at LPA's Decatur facility, her son was hospitalized for serious health conditions.   (Doc. 59-1, p. 9, tpp. 29–32).   In February 2016, her mother was

diagnosed with cancer. Ms. Johnson took time off from work to take her mother to doctor's appointments and surgery. (Doc. 59-1, p. 34, tpp. 131–32). On June 16, 2016, Ms. Gist approved Ms. Johnson's request to take a day off for her son's medical appointments. (Doc. 59-1, p. 36, tp. 139). On June 20, 2016, Ms. Johnson requested, and Ms. Gist approved, more time off because she needed to take her son to a neurologist. (Doc. 59-1, p. 41, tpp. 157–59). After the neurologist appointment, Ms. Johnson requested from Ms. Gist extended time off until July 1, 2016. (Doc. 59-1, p. 41, tpp. 159–60). Because Ms. Johnson did not have accrued paid time off remaining, she was not eligible for a leave of absence. Ms. Gist emailed Ms. Lehnhoff to request an exception to the company leave policy so that Ms. Johnson could have leave through July 1, 2016. (Doc. 60-16, p. 2). LPA granted Ms. Gist's request and approved Ms. Johnson's leave through July 1, 2016. (Doc. 59-1, p. 42, tpp. 163–64).

Ms. Johnson testified that when her mother was in the ICU or her son was in the hospital, Ms. Gist "would give [Ms. Johnson] a hard time about taking off and ask if [she] could come in for a few hours or open or close the facility later at night." (Doc. 64-1, p. 9, ¶ 18). While Ms. Johnson was on leave, she called Ms. LeJeune to tell her that she was considering resigning because of the stress she was experiencing with her family, the recurring situations with Ms. Gist and Ms. Pettus, the iPad incident, the way LPA ignored her concerns, and her feeling that the Decatur facility

should be run differently.  (Doc. 59-1, pp. 67, 100–01, tpp. 261–62, 396–97; Doc.

59-8, pp. 37–38, tpp. 144–45).  Ms. LeJeune responded that Ms. Johnson should take

some time to think about it before making a final decision.  (Doc. 59-1, p. 67, tp.

263).  Ms. LeJeune testified that Ms. Johnson said that she was stressed about getting

to her son's medical appointments because of her commute to work.  (Doc. 59-8, p.

38, tp. 145).  Ms. LeJeune also testified that she told Ms. Johnson "not to give up"

and that LPA "would be here for her . . . when she gets back."  (Doc. 59-8, p. 38, tp.

145).

Ms. Johnson resigned on June 27, 2016 by sending the following email to Ms.

LeJeune:

> After a lot of thought and careful consideration, I am still going to
> resign of my position at 7364 it [sic] is in my best interest at this time
> to follow through with my decision.  I wish things were different but
> with the current situations I feel it's in mine and my families [sic] best
> interest to follow my decision thank [sic] you so much for trying to
> work with me during this time.  I feel I have to put my family first right
> now.  Thanks again[.]

(Doc. 59-3, p. 1).  Ms. Johnson contends that she had no choice but to resign because

of the race and age-based discrimination and hostile work environment that Ms. Gist

and Ms. Pettus created and LPA ignored.

## III.   Discussion

### A.   <u>Title VII Race Discrimination</u>

Ms. Johnson contends that LPA discriminated against her because she is white in violation of Title VII.  When a plaintiff like Ms. Johnson relies on circumstantial evidence to prove a race discrimination claim under Title VII, a district court may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate the plaintiff's evidence to determine whether factual disputes preclude summary judgment.  *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).   Under *McDonnell–Douglas*, a plaintiff initially must establish a *prima facie* case of discrimination.  A *prima facie* case of discrimination consists of proof that (1) the plaintiff is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly-situated individual outside of her protected class.  *Maynard*, 342 F.3d at 1289.

Because Ms. Johnson resigned from LPA, she cannot establish that she suffered an adverse employment action, the third element of her *prima facie* case, unless she can demonstrate that she was constructively discharged.  *Rowell v. BellSouth Corp.*, 433 F.3d 794, 805 (11th Cir. 2005).  "'Constructive discharge occurs when an employer deliberately makes an employee's working conditions

intolerable and thereby forces him to quit his job.'" *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)).   To establish a constructive discharge, a plaintiff must demonstrate that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Bryant*, 575 F.3d at 1298; *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) ("In evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings.   Instead, we employ an objective standard.").   "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." *Bryant*, 575 F.3d at 1298 (citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992)).

Ms. Johnson contends that she was constructively discharged because of Ms. Gist's and Ms. Pettus's actions made her working conditions so unbearable that she had no reasonable choice but to resign.   (*See* Doc. 69, pp. 26–28).   The Court disagrees.

Ms. Johnson worked with Ms. Gist for five months and Ms. Pettus for six months.   By mid-June of 2016, Ms. Johnson knew that Ms. Gist no longer would be her supervisor because Carol Simms was taking Ms. Gist's place as district manager as of July 1, 2016.   (Doc. 59-1, pp. 68–69, tpp. 266–69; Doc. 59-22, p. 2).   Ms. Gist was returning to her previous position as an operations support specialist.   (Doc. 59-

5, p. 4, tpp. 10–11; p. 47, tpp. 183-84).[3]  No evidence suggests that Ms. Johnson had reason to believe that Ms. Simms would discriminate against her, and as an operations support specialist, Ms. Gist would not be in the chain of command for Ms. Johnson's position as director of LPA's Decatur facility.  The director reported to the district manager, who reported to the vice-president for the southeast division, who reported to the COO.  (Doc. 59-1, pp. 22, 87–89, tpp. 84, 344, 348–49) (Ms. Johnson explaining that, as director, she reported to the district manager, and that the district manager supervised all directors in the district); (Doc. 59-17, pp. 4, 7, tpp. 12, 22–23) (VP Lehnhoff explaining that she supervised the district managers in her region and reported to the COO).  Ms. Johnson resigned two weeks after learning that Ms. Gist no longer would be her district manager and four days before Ms. Gist left.  For purposes of summary judgment, the Court accepts Ms. Johnson's assertion that Ms. Gist did not support her, sided with Ms. Pettus, and undermined her efforts to discipline Ms. Pettus, but no reasonable person would feel compelled to resign when the person had worked with a difficult and unsupportive supervisor for only five months and knew that the supervisor was about to be replaced.

---

[3] Ms. Gist testified that as an operations specialist for LPA in Alabama, she would help Ms. Simms transition to district manager.  Ms. Johnson understood that Ms. Gist would help with the transition to Ms. Simms.  (Doc. 64-1, p. 10, ¶ 19).  As of October 1, 2016, Ms. Gist was finished supporting Ms. Simms, and LPA directed Ms. Gist to return to Georgia where Ms. Gist had worked before she transferred to Alabama in early 2016.  (Doc. 59-5, p. 47, tpp. 183-84).

As for Ms. Pettus, as Assistant Director of LPA's Decatur location, she was Ms. Johnson's subordinate employee.   Ms. Johnson documented Ms. Pettus's improper conduct with notes to Ms. Pettus's file in March 2016 and April 2016.   And on June 7, 2016, with the support of "Corporate," Ms. Johnson issued a Performance Improvement Plan to Ms. Pettus.   The PIP stated that failure to achieve acceptable performance might result in "further action," including "separation of employment." (Doc. 60-17, p. 8; *see also* Doc. 60-17, p. 9).   No reasonable person would resign less than one month after issuing a PIP to a troublesome subordinate employee who the person could continue to discipline up to the point of termination.   While Ms. Johnson may not have believed that Ms. Gist would have supported an eventual request to fire Ms. Pettus, Ms. Gist would not have been Ms. Johnson's supervisor by the time Ms. Johnson determined whether Ms. Pettus had achieved the goals of the June 7, 2016 PIP.

Because Ms. Johnson has not identified evidence that would enable reasonable jurors to conclude that she was constructively discharged, she cannot establish a prima facie case of Title VII race discrimination under the *McDonnell Douglas* framework.   Even so, Ms. Johnson may proceed with her discrimination claim if she can assemble a "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations omitted).   A plaintiff can

show a convincing mosaic with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)).  No matter the form of the circumstantial evidence that the plaintiff presents, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Ms. Johnson argues that reasonable jurors could conclude that Ms. Gist was on a crusade to oust all white directors from LPA's facilities in Alabama.  (*See* Doc. 69, pp. 27–28).  In her affidavit, Ms. Johnson states:

> While I was employed the LPA Directors in Alabama worked really close with each other so that our district would make our numbers.  So when one of us had a visit from Ms. Gist, we would reach out to each other and share what deficiencies we had to the other Directors would be prepared for Ms. Gist' visit at their facility.  During these calls, I learned that only the Caucasian directors were having the frequent visits from Gist and that she was finding fault with our facilities.  When talking to the African American directors they would state that Gist was all good with how they were running the facility and would laugh when I shared about the frequent visits and perceived deficiencies by Gist.

(Doc. 64-1, pp. 14–15, ¶ 27).  Ms. Johnson contends that within four months of becoming LPA's District Manager for Alabama, "[Ms.] Gist had terminated or caused to resign" the only three white directors of LPA daycares in Alabama and replaced them with black employees.  (Doc. 64-1, p. 5, ¶ 10; Doc. 69, p. 12, ¶ 6). She adds:  "After the three Caucasian directors had either resigned or been terminated by Gist, all of the African American directors were given bonus[es] to stay with LPA."  (Doc. 64-1, p. 14, ¶ 27).

The three white directors were Ms. Johnson; Candace Herren at LPA's daycare in Grayson Valley, Alabama; and Candace Shannon at LPA's daycare in Madison, Alabama.  (Doc. 59-1, p. 85, tp. 334).  During her deposition, Ms. Johnson could not remember information about Ms. Shannon and testified that she had no knowledge of racial discrimination or harassment against Ms. Shannon.  (Doc. 59-1, pp. 85–86, tpp. 334–37).  Ms. Herren is white and was 51 years old when, on May 2, 2016, LPA terminated her as the Academy Director of the Grayson Valley facility.  (Doc. 64-9, pp. 9, 11, tpp. 32, 40; Doc. 64-15, p. 5).  LPA replaced Ms. Herren with Valerie Pugh, who is black.  (Doc. 64-9, p. 38, tp. 145).  LPA contends that it terminated Ms. Herren for committing several Alabama Department of Human Resources licensing deficiencies, including improperly maintaining staff and student records, neglecting hazards on the property, over-enrolling children in classrooms, letting new hires work without proper training or background checks, and neglecting

maintenance of busses.  (Doc. 64-15, pp. 2–5).  The paperwork relating to Ms. Herren's termination states:  "Based on your poor overall performance and lack of judgment we have decided to terminate your employment effective today."  (Doc. 64-15, p. 5).  The paperwork indicates that Ms. Gist, Rhona Kirk, and VP Lehnhoff were involved in Ms. Herren's termination.  (Doc. 64-15, pp. 2, 5).  The paperwork also indicates that Ms. Herren had a note to file and a PIP the year before Ms. Gist became district manager and a PIP a few weeks after Ms. Gist became district manager.  (Doc. 64-15, p. 2).  Ms. Herren contends that LPA, with Ms. Gist as the decision-maker, terminated her because she was white, was 51 years old, had Crohn's disease, and requested FMLA leave.  (Doc. 64-5, pp. 4–5).[4]

According to Ms. Johnson, she "realized she was next on [Ms.] Gist's list to be terminated" after Ms. Herren's termination.  (Doc. 69, p. 27).  But Ms. Johnson's subjective expectation of an inevitable race-based termination cannot support a race discrimination claim, even one based on a mosaic of circumstantial evidence of discriminatory animus.   As the pattern jury charges for a Title VII race discrimination charge make clear, to prevail, a plaintiff must be able to prove by a preponderance of the evidence that she either was discharged or denied a promotion

---

[4] Ms. Herren brought claims against LPA under the FMLA, Title VII, the ADEA, the AADEA, the ADA, and § 1981 in the case styled *Herren v. La Petite Academy, Inc.*, case no. 2:16-cv-01308-LSC.  (Doc. 72-1).  On May 7, 2019, Judge Coogler granted summary judgment in LPA's favor on Ms. Herren's claims.  (Doc. 72-2).  Ms. Herren has appealed that decision.  (Doc. 99 in case no. 2:16-cv-01308-LSC).

(or suffered some other adverse employment action).  If a plaintiff cannot cross that threshold, then a jury's work is done.  Eleventh Circuit Pattern Jury Instruction 4.5 (http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCivilPatternJuryInstructionsCurrentComplete.pdf?revDate=20200227, last visited May 28, 2020).[5]  Even if Ms. Johnson were correct about her theory that Ms. Gist was on a campaign to replace all of LPA's white directors with black employees, Ms. Johnson outlasted the five-month campaign, and, by her own admission, when she told LPA Vice-President Lejeune of her plan to resign, Ms. LeJeune "asked me to hold my – she did not want to accept my resignation that day, but she wanted me to take the [leave] period that had been given to me and she wanted me to think this process through before I give [sic] her my final decision."  (Doc. 59-1, p. 67, tp. 263).  On this record, Ms. Johnson's race discrimination claim fails as a matter of law.

## B.   ADEA and AADEA Age Discrimination

Next, Ms. Johnson contends that LPA discriminated against her because of her age in violation of the ADEA and the AADEA.  A plaintiff may use the *McDonnell–Douglas* burden-shifting framework to survive a motion for summary judgment on an age discrimination claim brought under both the ADEA and the

---

[5] *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007) ("The pattern jury instructions are drafted by a committee of district judges appointed by the Chief Judge of the Circuit and adopted by resolution of the Judicial Council of the Eleventh Circuit. Although generally considered a valuable resource, reflecting the collective research of a panel of distinguished judges, they are not binding; Eleventh Circuit case law takes precedence.") (internal quotation marks and citations omitted).

AADEA.  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013); *Perry v. Batesville Casket Co.*, 551 Fed. Appx. 987, 989 (11th Cir. 2014) (citing *Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007)).  An ADEA/AADEA plaintiff also may satisfy the convincing mosaic standard to avoid summary judgment on her age discrimination claims.  As discussed, Ms. Johnson has not demonstrated that she suffered an adverse employment action, so her age discrimination claim fails under both tests.  Eleventh Circuit Pattern Jury Instruction 4.10(http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCivilPatte rnJuryInstructionsCurrentComplete.pdf?revDate=20200227, last visited May 28, 2020).

And Ms. Johnson's evidence of age-based discrimination is extremely thin.  Ms. Johnson points out that Ms. Pettus, Ms. Gist, and Ms. Pugh—Ms. Herren's replacement at LPA's Grayson Valley facility—were all younger than her (Ms. Johnson).[6]  But she offers no other evidence of age discrimination, and nobody implicitly or explicitly remarked about Ms. Johnson's age.  Therefore, the Court will grant LPA's motion for summary judgment on Ms. Johnson's claims for age discrimination under the ADEA and the AADEA.

---

[6] Neither Ms. Johnson nor LPA identifies Ms. Pettus's, Ms. Gist's, or Ms. Pugh's age, though Ms. Johnson testified that Ms. Pettus looked to be in her thirties.  (*See* Doc. 59-1, p. 84, tp. 330).  For purposes of summary judgment, the Court will assume that Ms. Pettus, Ms. Gist, and Ms. Pugh are substantially younger than Ms. Johnson.

### C.   <u>Retaliation Under Title VII</u>

Ms. Johnson brings a claim against LPA for retaliation under Title VII.  This claim fares no better than Ms. Johnson's Title VII discrimination claim because of the absence of an adverse employment action.

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To state a claim for retaliation under Title VII, the plaintiff must show "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events."  *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quotation omitted).

For purposes of a retaliation claim, an "adverse employment action" is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The Eleventh Circuit has described actionable adverse employment actions as "decisions such as termination, failure to hire, or demotion," *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004); "a serious and material change in the terms, conditions, or privileges of employment," *Davis v.*

23

*Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted); and conduct that "deprives [the employee] of employment opportunities, or adversely affects his or her status as an employee," *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Despite the more lenient standard in the retaliation context, Ms. Johnson still has not demonstrated that she suffered an adverse employment action. As discussed, Ms. Johnson voluntarily resigned a few days before Ms. Gist was scheduled to leave her post as district manager. There is no evidence that, had Ms. Johnson not resigned, LPA, through Ms. Simms, would have taken an action against Ms. Johnson that would have caused "a serious and material change in the terms, conditions, or privileges of [Ms. Johnson's] employment," or "deprive[d] [her] of employment opportunities, or adversely affect[ed] . . . her status as an employee." *See Davis*, 245 F.3d at 1239; *Gupta*, 212 F.3d at 587. Ms. Johnson attested that Ms. Kimball, Ms. Gist's predecessor, worked with her and wanted to see her succeed. (Doc. 64-1, p. 4, ¶ 6; p. 8, ¶ 16). Ms. Simms may have done the same, had Ms. Johnson given her the chance. And, as discussed, HR Manager Ms. LeJeune was supportive of Ms. Johnson and encouraged Ms. Johnson not to resign. Therefore, the Court will grant LPA's motion for summary judgment on Ms. Johnson's Title VII retaliation claim.

### D.   Retaliation Under the ADEA and the AADEA

Like Title VII, the ADEA and the AADEA prohibit employers from taking an

24

adverse action against an employee because she opposes unlawful employment practices. *See* 29 U.S.C. § 623(d); Ala. Code § 25-1-28. The analytical framework that applies to Title VII retaliation claims also applies to retaliation claims brought under the ADEA and the AADEA. *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1258, 1264 (N.D. Ala. 2014). Because Ms. Johnson's retaliation claim fails under Title VII, her retaliation claim also fails under the ADEA and the AADEA. The Court will grant LPA's motion for summary judgment on those claims.

### E.   Hostile Work Environment Under Title VII, the ADEA, and the AADEA

Next, Ms. Johnson brings a claim against LPA for a racially hostile work environment under Title VII and for an age-based hostile work environment under the ADEA and the AADEA. Because there is no evidence of conduct motivated by ageism in this case, the Court focuses on Ms. Johnson's Title VII hostile work environment claim.

To prove that she was subjected to a racially hostile work environment, Ms. Johnson must show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)) (internal marks omitted). To avoid summary judgment, Ms. Johnson must present evidence from which a jury

could find that she is a member of a protected class; she was subject to unwelcome harassment; the harassment was based on her race; the harassment was severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and LPA is responsible for the harassment under a theory of either direct or vicarious liability. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).

In its brief in support of its motion for summary judgment, LPA argues that the Court does not have to decide whether Ms. Johnson has established that her work environment at the Decatur facility was hostile because LPA has established both elements of a *Faragher/Ellerth* defense to Ms. Johnson's hostile work environment claim. (*See* Doc. 58, p. 24 (citing *Fodor v. Eastern Shipbuilding Group*, 598 Fed. Appx. 693, 695–96 (11th Cir. 2015)). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate . . . authority over the employee" like Ms. Gist. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Where, as here, "no tangible employment action is taken," the employer may avoid liability by demonstrating "(a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

In support of its contention that the *Faragher/Ellerth* defense applies here, LPA points to its "nondiscrimination, anti-harassment, zero tolerance and related policies" and Ms. Johnson's failure to "file a harassment complaint or discrimination complaint" or to contact HR directly. (Doc. 58, p. 23).[7]  Ms. Lehnhoff testified that Ms. Johnson could have contacted her HR manager to complain about her (Ms. Johnson's) work environment, but Ms. Lehnhoff was not aware of such a complaint. (Doc. 59-17, p. 2, tp. 1; p. 54, tp. 209).

But Ms. Johnson stated in her affidavit that she complained to HR Manager LeJeune and to Ms. Lehnhoff "about the racial discrimination of Ms. Gist and Ms. Pettus and my inability to work successfully in the hostile environment the two were creating for me." (Doc. 64-1, pp. 5–6, ¶ 11).  Ms. Johnson described her specific complaints to Ms. LeJeune, stating, for example, that "Gist and Pettus were trying to force [her – Ms. Johnson] to quit and Pettus made it clear on several occasions that she wanted me out and the position of Director for herself." (Doc. 64-1, p. 12, ¶ 22).  Ms. Johnson attested that despite her complaints, "nothing was done to

---

[7] LPA cites to Exhibit C-1, pp. 82-85 to identify its policies. (Doc. 58, p. 23, n. 8). The Court cannot find Doc. C-1 in the evidentiary record.  LPA did not comply with the Court's instruction to cite to the evidentiary record by CM/ECF document and page number. (Doc. 9, p. 10).  The Court believes LPA may have meant to cite to Exhibit C, but the Court does not know what pages contain the policies to which LPA refers; pages 82–85 do not exist in Exhibit C.

investigate my concerns, nor cure the racially hostile environment." (Doc. 64-1, p. 6, ¶ 11).

In its reply brief, LPA changes gears and argues that there was no evidence of a hostile work environment at the Decatur facility. (Doc. 71, pp. 7–10). The Court has not ordered a sur-reply to this new argument because the facts that Ms. Johnson alleges in her affidavit, viewed in the light most favorable to her, are sufficient to create a question of fact regarding the work environment at the Decatur facility. And the facts that Ms. Johnson discusses in her brief contradict LPA's evidence regarding Ms. Johnson's failure to complain about a racially hostile work environment. Therefore, LPA has not carried its burden on its affirmative defense with respect to its liability for Ms. Gist's alleged racially hostile conduct.

As for Ms. Pettus's conduct, "[l]iability for hostile work environment differs depending on whether the harassment was perpetrated by a co-worker or a supervisor." *Terell v. Paulding Cnty.,* 539 Fed. Appx. 929, 932 (11th Cir. 2013) (internal citations omitted).[8]  When harassment is perpetrated by a co-worker like Ms. Pettus, the employer may be held liable only if the employer "was negligent

---

[8] In *Vance v. Ball State Univ.*, 570 U.S. 421 (2013), the Supreme Court held that a supervisor is one whom "the employer has empowered ... to take tangible employment action against the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  570 U.S. at 431 (citation and internal quotation marks omitted).

with respect to the offensive behavior." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Ms. Johnson has the burden of proving that LPA was negligent.

To establish that LPA was negligent, Ms. Johnson "'must show that [LPA] either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action.'" *Hill v. Wal-Mart Stores, Inc.*, 510 Fed. Appx. 810, 814 (11th Cir. 2013) (quoting *Watson v. Blue Circle, Inc.,* 324 F.3d 1252, 1259 (11th Cir. 2003)). "Actual notice is established by proof that management knew of the harassment." *Watson*, 324 F.3d at 1259. "When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established." *Watson*, 324 F.3d at 1259. As with the allegedly hostile work environment created by Ms. Gist, based on the evidence in the record, there is a disputed issue of fact with respect to actual notice of Ms. Pettus's alleged racially hostile conduct.

Accordingly, the Court denies LPA's motion for summary judgment on Ms. Johnson's Title VII hostile work environment claim.

### F.    Negligent or Wanton Hiring, Training, Supervision, and Retention

Finally, Ms. Johnson contends that LPA committed the tort of negligent or wanton hiring, training, supervision, and retention because of the alleged race and

age-based discrimination, retaliation, and hostile work environment committed by Ms. Gist and Ms. Pettus.  This claim fails as a matter of law.

Under Alabama law, to hold an employer liable for negligent hiring, training, supervision, or retention, the plaintiff must show that an employee committed an Alabama common law tort.  *Rhodes v. Arc of Madison Cty., Inc.*, 920 F. Supp. 2d 1202, 1244 (N.D. Ala. 2013); *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002); *see Shuler v. Ingram & Assocs.*, 441 Fed. Appx. 712, 721 (11th Cir. 2011) ("Here, the Shulers's wanton and reckless supervision and training claim fails as a matter of law because they have failed to establish that Ingram's employees committed any tort under Alabama law . . . .").

Ms. Johnson has not identified an Alabama common law tort that an LPA employee committed.  Her claims under Title VII and the ADEA arise under federal law.  And her claim brought under the AADEA arises under Alabama statutory law, not common law.  Even if her AADEA theory could support a failure to train or supervise claim under Alabama law, Ms. Johnson's AADEA claim fails as a matter of law because she has not offered evidence of age discrimination.  So LPA is entitled to judgment as a matter of law on Ms. Johnson's claim for negligent hiring, training, supervision, and retention.  *See Burnett v. Harvard Drug Grp., LLC*, 2014 WL 223081, at *6 (N.D. Ala. Jan. 21, 2014) (finding that the plaintiff's claim for negligent hiring, training, supervision, and retention failed because the claim was

"based entirely on the same alleged conduct that supports his claims for race discrimination, hostile work environment, and retaliation under Title VII and 42 U.S.C. § 1981").

## IV.    Conclusion

For the foregoing reasons, by separate order, the Court will grant in part and deny in party LPA's motion for summary judgment.

**DONE** and **ORDERED** this June 1, 2020.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE